E-FILED
Friday, 26 January, 2018  12:39:57 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JAMES R. HAUSMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| TODD GREEN; JOSHUA WAGONER; | ) | |
| THE GOLD CENTER, INC., an Illinois | ) | |
| Corporation; ILLINOIS DEPOSITORY | ) | |
| CORPORATION, an Illinois Corporation; | ) | |
| and ILLINOIS ARMORED TRANSPORT, INC., | ) | |
| an Illinois Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiff, James R. Hausman ("Hausman"), by his attorneys, Hinshaw & Culbertson, LLP, for his Complaint against Defendants, Todd Green ("Green"); Joshua Wagoner ("Wagoner"); The Gold Center, Inc., an Illinois corporation ("GCI"); Illinois Depository Corporation ("IDC"); and Illinois Armored Transport, Inc., an Illinois corporation ("IATI"), alleges:

## NATURE OF THIS ACTION

1.     This action results from the abuse of power within three closely held corporations by their majority shareholder and managers culminating in a failed business relationship. Hausman is seeking relief because of their oppression, abuse of control, gross mismanagement, and waste of corporate assets.  Because the actions of Green and Wagoner have caused and will continue to cause material damage to the three corporations, Hausman seeks either an Order dissolving the corporations or requiring the purchase of his shares in the corporations for fair value pursuant to Sections 12.56(b)(11) and (12) of the Illinois Business Corporation Act of

1983 ("BCA"), 805 ILCS 5/12.256(b)(11), (12).  Furthermore, on information and belief, Defendants intend to move the Gold Center business to the State of Florida, a move which will continue to exacerbate the impairment of Hausman's participation in the business and further damage the three corporations.  As a consequence, Hausman seeks an Order enjoining the move of the Gold Center business, as herein defined, during the pendency of this action.

## JURISDICTION AND VENUE

2.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that:

  a.      Hausman is and, for some time prior to the commencement of this action, has been a citizen of the State of Wisconsin;

  b.      Green is a citizen of the State of Illinois;

  c.      Wagoner is a citizen of the State of Illinois;

  d.      GCI is a citizen of the State of Illinois having been incorporated in Illinois and having its principal place of business in Illinois;

  e.      IDC is a citizen of the State of Illinois having been incorporated in Illinois and having its principal place of business in Illinois;

  f.      IATI is a citizen of the State of Illinois having been incorporated in Illinois and having its principal place of business in Illinois;

  g.      The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00;

3.      This action is not a collusive one designed to confer jurisdiction in a court of the United States in a case over which it would not otherwise have jurisdiction.

300096701v5 0996081

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (2) in that

a) all Defendants reside in the Central District of Illinois, and b) a substantial part of the events

giving rise to this action occurred in the Central District of Illinois.

## PARTIES

5.      Hausman presently owns, and owned at the time of the transactions that form the

basis of this Complaint, 20% of the shares of GCI, IDC, and IATI.  He is one of three members

of the GCI board of directors.

6.      Hausman is also the fee owner of real property from which the three corporations

principally conduct their business, located at 3000 West Iles Avenue, Springfield, Illinois, ("the

Gold Center property") and legally described as follows:

> The West 7.74 feet of Lot No. 1 of White Oaks West Third Addition to the City of Springfield, Sangamon County, Illinois, containing 0.03 acres, more or less.

> Also, part of the North ½ of the Northeast ¼ of Section 12, Township 15 North, Range 6 West of the Third Principal Meridian, Sangamon County, Illinois, described as follows:  From the Northwest corner of the Northeast ¼ S. 89°07'22" E., on the North line of Section 12, 1,596.80 feet to a point on the Westerly right-of-way line of West White Oaks Drive; thence S. 00°53'14" W., 95.40 feet thence S. 09°27'15" W., 77.38 feet; thence S. 17°58'17" W., 100.51 feet; thence S. 13°38'44" W., 132.58 feet; thence continuing on said right-of-way line S. 17°58'17" W., 123.40 feet to the Southeast corner of Lot No. 1 of White Oaks West Third Addition; thence N. 72°01'43" W., on the Southerly line of said Lot No. 1, 183.00 feet to the Southwest corner of Lot No. 1 said point being the point of beginning; thence continuing N. 72°01'43" W., 41.73 feet to a point on the Northerly line of White Oaks West Fifth Addition, thence N. 17°58'31" E., 203.61 feet to the Southerly right-of-way line of Iles Avenue; thence S. 54°30'23" E., on said Southerly right-of-way line, 26.63 feet to the Northwest corner of said Lot No. 1; thence S. 13°12'05" W., on the Westerly line of said Lot No. 1, 196.26 feet to the point of beginning, containing .015 acres, more or less.

3

300096701v5 0996081

7.      Prior to January 31, 2014, Hausman was the sole shareholder and operator of GCI, IDC, and IATI.

8.      Green is presently the record owner of 80% of the shares in GCI, IDC, and IATI, is the president of those three corporations, and is a member of each corporation's board of directors.

9.      Green is also the president of Green Family Stores, Inc., which operates several automobile dealerships in Central Illinois, including a dealership selling Dodge branded vehicles. Green is also the secretary of Green Family Insurance, Inc.

10.     Wagoner is the secretary for GCI, IDC, and IATI and is a member of each corporation's board of directors.

11.     On information and belief, a 5% equitable or beneficial interest in GCI, IDC, and IATI was conveyed to Wagoner by Green.

12.     On information and belief, a 2% equitable or beneficial interest in GCI, IDC, and IATI was conveyed by Green to another employee of the Green Family Stores, Inc., Mike Quimby.

13.     GCI is an Illinois corporation and was organized by Hausman on June 1, 1978. The authorized capital stock of GCI consists of 750 shares of common stock with a par value of $500.00 per share.

14.     GCI is joined herein under Fed.R.Civ.P. 19 to enable the Court to accord complete relief among the parties.

15.     IDC is an Illinois corporation and was organized by Hausman on April 25, 1988.

4

16.     IDC is joined herein under Fed.R.Civ.P. 19 to enable the Court to accord complete relief among the parties.  The authorized capital stock of IDC consists of 100 shares of common stock with a par value of $1.00 per share.

17.     IATI is an Illinois corporation and was organized by Hausman on April 25, 1988. The authorized capital stock of IATI consists of 100 shares of common stock with a par value of $1.00 per share.

18.     IATI is joined herein under Fed.R.Civ.P. 19 to enable the Court to accord complete relief among the parties.

## THE GOLD CENTER BUSINESS

19.     Hausman has over forty years' experience in the operation of a multi-faceted precious metals business, including buying and selling gold, diamonds, rare coins, sterling silver, and watches, storing and transporting precious metals, refining gold, and assaying metals.  He has been licensed by the United States Mint as an authorized purchaser of Silver Eagles and to conduct related matters.  In furtherance of that business, he incorporated GCI, IDC, and IATI as described above.

20.     GCI is engaged in the business of buying and selling numismatic coins, investment bullion, other gold, silver, platinum, and other precious metals, and diamonds.  Its inventory includes coins from the United States Mint, the Royal Canadian Mint, and other premier mints.

21.     With six induction furnaces located on the Gold Center property, GCI also melts and refines precious metals.

22.     IDC is engaged in the business of renting storage lockers to its customers for the deposit and storage of precious metals and coins.

300096701v5 0996081

23.    IATI is engaged in the business of providing secure transportation of precious metals and coins.

24.    The principal place of business of GCI, IDC, and IATI (collectively "the Gold Center business") is the Gold Center property.

## HAUSMAN'S TRANSACTIONS WITH GREEN

25.    By late 2013, Hausman had decided to retire from the day-to-day operations of the Gold Center business.

26.    In December 2013, Hausman and Green executed a Letter of Intent ("LOI") dated December 11, 2013, addressing *inter alia,* the transfer of the controlling interests in the three corporations from Hausman to Green.  The LOI, a copy of which is attached as Exhibit A, was signed by Green on December 13, 2013, and by Hausman on December 17, 2013.

27.    On January 31, 2014, and February 1, 2014, Hausman and Green entered into a series of agreements in order to effectuate the transfer and sale of the Gold Center business.

28.    Among those agreements was a Stock Purchase Agreement ("SPA") dated January 31, 2014, a copy of which is attached as Exhibit B.

29.    Pursuant to the SPA, in exchange for a specific amount of money and other consideration, Hausman sold and transferred to Green 80% of the shares of GCI (600 of the 750 authorized shares), 80% of the shares of IDC (80 of the 100 authorized shares), and 80% of the shares of IATI (80 of the 100 authorized shares) (SPA, Sections 1.1, 1.2, 2.5, 2.6, 2.7).  Hausman and Green further agreed that:

a.    at the closing of the SPA, GCI's assets included "all furniture, fixtures, furnaces, assay machines, Intellectual Property, and equipment ('fixed assets'), and all other assets which are owned by GCI on January 31, 2014, which includes depreciated fixed assets...." (SPA, Section 2.15);

6

300096701v5 0996081

b.      as part of the transaction, a lease for the Gold Center property between Hausman and GCI (SPA, Section 5.3e), a Consulting Agreement (SPA, Section 5.3f), and a Shareholders Agreement (SPA, Section 5.3h) would be executed; and

c.      disputes arising under the SPA would be resolved by arbitration (SPA, Section 9.3).

30.     Also among those agreements, and in accordance with the SPA, was a Lease for the Gold Center property ("Lease"), dated February 1, 2014, among Hausman, GCI, IATI, IDC, and Green, a copy of which is attached as Exhibit C.

31.     Under the Lease, in exchange for certain rental payments and the performance of other promises, Hausman leased the Gold Center property to GCI, IDC, and IATI, for an initial term of five years (Lease, Section 1.02) with two successive options to extend the leasehold by five years each (Lease, Section 20.01).

32.     Green was made a party to the Lease "for purposes of creating a Right of First Refusal and an Option to Purchase the Premises" (introductory, unnumbered paragraph to the Lease).

33.     Green's option to purchase the Gold Center property and the terms thereof are described in Section 26.02 of the Lease:

> 26.02  Option to Purchase  Optionor (Landlord) does hereby grant, sell, bargain, alien and convey to Optionee (Todd Green) the exclusive and irrevocable option to purchase the Premises on the terms and conditions hereinafter set forth (the "Option").
>
> (i).    Option Period.  Optionee shall have the right to exercise the Option by written notice to Optionor (the "Option Notice"), which Option Notice may be given not less than 120 days prior to the termination of the final year of the initial term of the Lease, or not less than 120 days prior to the termination of the final year of any Lease extension period (the "Option Period").

300096701v5 0996081

(ii).    Exercise of Option.  At any time prior to the expiration of the Option Period, Optionee may exercise the Option by sending notice to Optionor in accordance with Paragraph (i) hereof.  If the Option is exercised, this Agreement shall become a legally binding purchase and sale agreement between Optionor and Optionee and consummation of purchase of the Premises shall be effected according to the terms hereof.

(iii).    Purchase Price.  If the Option is exercised, the total purchase price (the "Purchase Price") shall be paid by Optionee to Optionor at the Closing (as hereinafter defined) in an amount equal to the Market Value of the Property (as hereinafter defined).  For purposes hereof, the "Market Value of the Property" shall be deemed to be its appraised value as determined by the method set out in this subsection.  Optionee and Optionor shall each select an independent, certified third-party appraiser, and the selected appraisers shall each appoint a third independent, certified third appraiser.  The value as determined by the third appraiser shall be the Market Value of the Property, but it shall not be lower than the lowest or higher than the highest value as determined by the first two appraisers.  The costs of all appraisals shall be equally divided between Optionor and Optionee.

(iv).    Closing.  If Optionee exercises the Option, closing of the conveyance of the Premises (the "Closing") shall occur no later than sixty (60) days following Optionee's notification to Optionor of exercise of the Option.  At the time of Closing, Optionee shall pay to Optionor the Purchase Price and Optionor, at Optionor's sole expense, shall deliver or cause to be delivered to Optionee such documents and instruments of conveyance as shall be required to transfer to Optionee the Premises, including an assignment of beneficial interest and state, county and local transfer tax declarations, all in form and substance satisfactory to Optionee.  The cost of any transfer taxes associated with the Closing shall be equally divided between Optionor and Optionee.

34.    In the event of a dispute under the Lease, all parties waived the right to a jury trial (Lease, Section 28.10).

35.    Also among those agreements, and in accordance with the SPA, was a Shareholders Agreement, dated January 21, 2014, among Hausman, Green, GCI, IDC, and IATI. The Shareholders Agreement provides that it and its terms are "to remain strictly confidential" (Shareholders Agreement, Section 7.21).  Consequently, the Shareholders Agreement, marked as

8

Exhibit D, is filed as a "Sealed Event" together with a Motion for Leave to File Under Seal in accordance with CDIL-LR 5.10(A)(2). The Shareholders Agreement permits "[d]isclosures that may be necessary to enforce the terms and conditions" of the Shareholder Agreement (Shareholders Agreement, Section 7.21(a)).

36.     Under the Shareholders Agreement, Hausman and Green agreed, *inter alia,* that:

a.     Green, Wagoner, and Hausman would comprise the board of directors for GCI (Shareholders Agreement, Section 1.1(a));

b.     the transfer of any of the shares of the corporations would be restricted to the corporations, other shareholders, a shareholders' spouse or descendants, or to others after the written approval of the shareholders (Shareholders Agreement, Article II);

c.     the purchase price for the shares in any transfer would be "the fair market value… based on an appraisal as of the transfer date" performed by "mutually acceptable qualified appraiser," or if unable to agree to an appraiser, then by an appraiser selected by an appraiser nominated by the seller shareholder and an appraiser nominated by the buying shareholder (Shareholders Agreement, Section 2.8); and

d.     any suit to enforce the Shareholders Agreement would be brought in state or federal courts located in Sangamon County.

37.     Also among those agreements, and in accordance with the SPA, was an Employment Agreement, dated January 31, 2014, among GCI, IDC, IATI, Hausman, and Hausman's spouse, Carol D. Hausman, a copy of which is attached as Exhibit E.

38.     Under the Employment Agreement, GCI employed Hausman and his spouse for a one year term, with possible extensions of one year each (Employment Agreement, Sections 3.1, 3.3).

300096701v5 0996081

39.     Hausman's duties under the Employment Agreement included advising Wagoner in his capacity as the new general manager of the Gold Center business, educating Green about the Gold Center business, liaising with the United States Mint, suppliers, and customers of the Gold Center business, and performing other services.

40.     Carol D. Hausman's duty under the Employment Agreement was to provide clerical services for Hausman.

41.     Disputes arising out of the Employment Agreement were required to be brought in the state or federal courts located in Sangamon County (Employment Agreement, Section 14).

## MISMANAGEMENT AND MISCONDUCT

42.     Wagoner started as general manager of the Gold Center business on January 31, 2014.  Wagoner also continued in a pre-existing management role for the Green Family Stores, Inc., serving as general manager for one or more of its automobile dealerships.

43.     Not long after Green assumed majority ownership and Wagoner assumed general management of the Gold Center business, events occurred that caused Hausman concern about the management of the Gold Center business by Green and Wagoner, which have affected the revenues of the Gold Center business.  Some of those events are:

a.     on information and belief, even though she performed no duties for the Gold Center business, Wagoner hired his spouse, Jennifer Wagoner, as an employee of GCI, and by an email dated February 24, 2014, a copy of which is attached as Exhibit F, directed GCI's accountant to set her salary at $3,500.00 per month;

b.     a long established and prudent policy of daily weighing precious metal purchases and checking the result against invoices by the Gold Center manager was abandoned;

10

c.      a long established and prudent policy of daily balancing gold purchases and sales by checking inventory in the gold cabinet to recorded transactions was abandoned;

d.      rather than use vehicles equipped with features for the safe and secure transportation of large amounts of precious metals, ordinary vans with "dealer plates" were used, and, on information and belief, without proper insurance for the cargo.  On information and belief, as further described herein, Green received a fee from the vans' manufacturer for their use as "demos."  Those fees were not shared with the Gold Center business, were not otherwise transferred to the Gold Center business, but were retained by Green, the Green Family Stores, Inc., or an affiliate thereof;

e.      misjudgments regarding the purchase and sale of valuable coins were being made, including 1900 O/CC Morgan Silver Dollars, a 1916 D Mercury Dime, and a 1929 pre-Federal Reserve System, Ohio National Bank note;

f.      numerous purchases of gold and jewelry were made from Ademota Adeniji, a person indicted for the theft and selling of gold and jewelry from the Illinois Treasurer's unclaimed property vault; and

g.      a transaction was made with a Peoria-based automobile dealer wherein Kruggerands received by the automobile dealer from a customer for the purchase of an automobile were delivered to the Gold Center in exchange for currency in an amount exceeding $10,000.00 without filing the requisite currency transaction report with the Department of the Treasury.

44.      During his tenure as general manager of the Gold Center business, Wagoner continued to serve as general manager of one or more of Green's automobile dealerships.  On

300096701v5 0996081

information and belief, Wagoner spent approximately 95% of his work time on automobile dealership business and 5% on the Gold Center business.

## BRIAN DENNEY AND BD LUXURY LLC

45. Brian Denney ("Denney") is a jeweler based in Springfield, Illinois.

46. Denney owns and operates a jewelry business known as BD Luxury LLC, also known as BD Luxury Investments LLC.

47. Since November 2016, Denney has operated BD Luxury LLC from the Gold Center property. *See D&B Duns Market Identifiers Plus (US)* for BD Luxury Investments LLC, attached hereto as Exhibit G.

48. Significant retail space and office space in the Gold Center property have been assigned to Denney to operate his jewelry business.

49. In accordance with Section 12.01 of the Lease (Ex. C), no part of the Gold Center property could be sublet without the prior written consent of Hausman.

50. Hausman has not given consent to sublet any part of the Gold Center property to Denney or to BD Luxury LLC.

51. When Hausman asked Green and Wagoner about Denney, Hausman was informed that Denney was an employee of the Gold Center business with compensation set at $10.00 per hour.

52. On information and belief, no revenue has been received or recorded by any Gold Center business from Denney or BD Luxury LLC as rent, commissions, or other items.

## THE DIAMOND TRANSACTION

53. In June 2015, a customer, whose initials are P.C., approached Wagoner at the Gold Center about a diamond transaction.

12

54.     P.C. possessed a 2-carat emerald cut diamond, but he wanted to exchange it for a 4-carat diamond.

55.     Wagoner presented P.C.'s 2-carat diamond to Denney who valued it at $15,000.00.

56.     Through Denney, the Gold Center located a 4.05-carat diamond and sold it to P.C. for the amount of $45,152,00, which was paid in the following manner:

| | | |
|---|---|---|
| a. | 2-carat diamond trade-in | $15,000.00 |
| b. | check ($21,198.00 for purchase and $1,802.00 for sales tax on that amount | $23,000.00 |
| c. | cash | $ 7,152.00 |
| | | $45,152.00 |

See attached Exhibit H comprising an invoice to P.C. for $23,000.00 (P.C.'s name has been redacted) and an email from Denney dated August 20, 2015.

57.     The Gold Center inventory, dated June 30, 2015, reflected the P.C. transaction in code number 419 and also reflected sales tax payable in the amount of $1,826.77 with respect to the transaction.  A copy of that inventory is attached as Exhibit I.

58.     The Gold Center inventory, dated July 31, 2015, appeared to reflect neither the possession of the 2-carat diamond in inventory nor its disposition.  It also did not reflect any sales tax relating to the P.C. transaction.  A copy of that inventory is attached as Exhibit J.

59.     On information and belief, Wagoner is in possession of the 2-carat diamond, but the accounting for that diamond is unknown.

## COUNTERFEIT COINS AND COUNTERFEIT HOLDERS

60.     In mid-2015, Hausman was requested by a Gold Center employee to analyze approximately 1000 silver dollars, including purported rare 1893 S Morgan silver dollars and

300096701v5 0996081

1889 CC Morgan silver dollars, received by the Gold Center from a person based in Pennsylvania.

61.     After reviewing the silver dollars, Hausman formed the opinion that at least six of the 1893 S Morgan silver dollars and at least two 1889 CC Morgan silver dollars were counterfeit as were the holders of those coins (the holders can also be counterfeited).

62.     Hausman reported the counterfeit coins and holders to an agent of the United States Secret Service who advised Hausman to send them back to the person in Pennsylvania who should, in turn, contact the party that sold those coins to him.

63.     Thereafter, Hausman tagged the counterfeit coins and holders with stickers to signify their counterfeit character, contacted the Pennsylvania person as instructed by the Secret Service, and informed those Gold Center employees present at the time of the arrangement.

64.     The next day Wagoner removed and disposed of the stickers.

65.     Wagoner then called the Pennsylvania person and advised that the Gold Center would get three bids for the counterfeit coins and holders, accept the highest bid, keep 10% thereof as its fees, and send the remainder to the person from Pennsylvania.

66.     On information and belief, notwithstanding the prohibitions of the Hobby Protection Act, 15 U.S.C. §2101(b), the Gold Center, acting through Wagoner, sold the alleged counterfeit coins and holders for approximately $127,000.00, without marking them as "counterfeit" or "copy."

67.     Rather than directing payment to the Gold Center, Wagoner told the buyers to make payment to IATI, thus keeping the transaction off the books of GCI and making it unlikely that the United States Mint would discover it.

300096701v5 0996081

68.     On information and belief, notwithstanding the actual bid of $127,000.00, Wagoner advised the person from Pennsylvania that the highest bid was $50,000.00 but that he would attempt to negotiate a higher price.

69.     On information and belief, the Gold Center paid the person from Pennsylvania $62,900.00 with respect to the sale of the counterfeit coins and holders, less than half of the sale price.

## BURNING COMPUTER CIRCUIT BOARDS

70.     Notwithstanding that the Lease prohibits the management, generation, storage, treatment, release, or disposal of hazardous materials on the Gold Center property (Ex. C, Art. 25), the Gold Center, through Green and Wagoner, entered an agreement with BLH Computers of Springfield, Illinois, to burn computer circuit boards in the Gold Center furnaces.

71.     On June 23, 2015, Gold Center employees, acting pursuant to directions from Green or Wagoner, burned circuit boards in the Gold Center furnaces.

72.     The ensuing fire caused the release of heavy black, toxic smoke and, potentially, cadmium, a hazardous chemical used in circuit boards, into the Gold Center property.

73.     The Springfield Fire Department was dispatched to the Gold Center property to assist with the consequences of the fire.  See photos, attached as Exhibit K.

74.     Following that fire, and for a significant period of time thereto, the Gold Center failed to clean the Gold Center premises of the residue from the fire.

## THE 2015 GRAMCO SILVER TRANSACTION

75.     In 2015 the Gold Center, acting through Wagoner and, on information and belief with the approval of Green, shipped and deposited more than $900,000.00 worth of silver to a California business identified as Gramco.  The Gold Center had previously done limited business with Gramco, but none with its principal, Dan Geiger.  On information and belief, Dan Geiger

300096701v5 0996081

had recently been released from prison at that time.  The Gold Center retained no security interest or lien on the silver and had no insurance on the silver at that time.

76.    Gramco neither paid the Gold Center for the silver nor retuned it to the Gold Center.

77.    On information and belief, Green and Wagoner failed to obtain insurance on the silver prior to its shipment; insurance was obtained after the transaction.

78.    Gramco filed bankruptcy in 2016.

79.    The silver was never recovered by GCI, and its disposition is unknown.

80.    Although it appears that the Gold Center's risk on the shipment and deposit of the silver to Gramco was subsequently insured by Lloyd's of London, the payment received by GCI from that carrier was $135,000.00 less than the value of the lost silver.

## HAUSMAN'S REQUEST FOR CORPORATE ACTION

81.    By letter dated February 15, 2017, a copy of which is attached as Exhibit L, Hausman, by one of his attorneys, demanded that the board of directors of GCI convene to consider several resolutions proposed by Hausman to address the afore-described issues and other matters.

82.    A revised letter, dated February 20, 2017, a copy of which is attached as Exhibit M, reasserted his demand for a board of directors meeting and added several resolutions, for a total of 21.

83.    Among other things, Hausman asked the board of directors to investigate the afore-described issues and bring suit as appropriate in order to enforce GCI's rights and protect its interests.

84.    The board of directors of GCI convened on March 14, 2017, to consider Hausman's resolutions.

300096701v5 0996081

85.    Each of Hausman's resolutions was defeated, with Hausman voting in the affirmative and Green and Wagoner voting in the negative.

## DEMAND FOR RECORDS

86.    On February 23, 2017, Hausman, through one of his attorneys, served a Demand to Examine Records to GCI, issued pursuant to Section 7.75 of the BCA, 805 ILCS 5/7.75.  A copy of that Demand is attached as Exhibit N.

87.    The purpose of the Demand was, *inter alia,* to determine the financial situation of the GCI and to determine whether mismanagement and illegal or improper conduct occurred in the management of GCI.

88.    Although purportedly agreeing to the Demand, GCI, through Green and Wagoner, effectively blocked and constructively denied Hausman's ability to review any record by:

   a.    refusing to identify, compile, produce, or set aside  responsive records;

   b.    while ostensibly allowing Hausman to review certain records on the GCI computer system, declining to assist him in locating responsive records thereon; and

   c.    removing computers on which responsive records were maintained.

89.    No records were produced by GCI in response to the Demand, and Hausman has been unable to locate or review any responsive records.

## GREEN SUES HAUSMAN AND PLANS
## TO MOVE THE GOLD CENTER BUSINESS TO FLORIDA

90.    As noted above, the Lease granted Green an Option to Purchase the Gold Center property. (Ex. C, Article 26.)

91.    On January 21, 2015, Green sent a Notice of Exercise of Option to Hausman, a copy of which is attached as Exhibit O.

300096701v5 0996081

92.     Green's Notice of Exercise of Option was given "not less than 120 days prior to the termination of the final year of the initial term of the Lease...."  (Ex. C, Section 26.02(i).)

93.     As provided in Section 267.02(iii) of the Lease, Green selected a purported "independent, certified third-party appraiser" and tendered to Hausman a copy of the appraisal from the Green-selected appraiser.  A copy of that appraisal is attached as Exhibit P.

94.     Based upon negotiations of the Lease, *i.e.,* those occurring before the signing of the Lease, and as provided in the LOI (Ex. A), Hausman understood that the period for Green to exercise the option was the final 120 days of the last year of the initial term of the Lease, in other words, not *more* than 120 days prior to the termination of the final year of the initial term, rather than not *less* than 120 days as stated in the Lease.

95.     Because of the pre-signing negotiations, the LOI, and his then-understanding of the Lease, Hausman declined to proceed to closing.

96.     In an email dated March 24, 2015, from Hausman's attorney to Green's attorney, Hausman claimed that the option could "only be exercised in the last year" and that there was "sufficient parole [sic] evidence supporting that construction if the language were to be deemed ambiguous."  A copy of that email is attached as Exhibit Q.

97.     On April 14, 2015, Green filed suit in Sangamon County against Hausman.  A copy of the Complaint filed therein is attached as Exhibit R.

98.     In that suit, Green contended, *inter alia,* that "Green's exercise of [the] option gave rise to a contract for the conveyance of real estate, subject to enforcement through an action for specific performance."  (Ex. R, par. 10).

99.     Hausman answered the Sangamon County Complaint and filed an Affirmative Defense and Counterclaim.

300096701v5 0996081

100.   The Affirmative Defense, a copy of which is attached as Exhibit S, addressed Hausman's then-understanding of the option period.

101.   Green filed an Answer to Affirmative Defense in the Sangamon County case, contending, *inter alia,* that claims based upon an "understanding between the parties outside the four corners of the Lease" were "nullifie[d]." A copy of Green's Answer to Affirmative Defense is attached as Exhibit T.

102.   After Green delivered to Hausman the Notice of Exercise of Option and the appraisal from his selected appraiser, Hausman selected "an independent, certified third-party appraiser" (Ex. C, Section 26.02(iii)) and tendered to Green a copy of the appraisal prepared by that appraiser. A copy of that appraisal is attached as Exhibit U. No independent, certified third appraiser was ever selected; no purchase price was agreed to; and no sale of the property occurred.

103.   On January 25, 2017, Green filed a motion to voluntarily dismiss without prejudice the Sangamon County case. Green's attorney contemporaneously sent a letter to Hausman's attorneys noting that "by the time we would get this case to trial and any appeals were finalized, any business rationale for having filed it in the first place would have ceased to exist." Copies of the Motion for Voluntary Dismissal and letter are attached as Group Exhibit V.

104.   By letter dated February 7, 2017, Hausman's attorney advised Green's attorney that Hausman agreed that "trial and appeal are not justified from a business perspective," that, accordingly, he was accepting Green's exercise of the option, and that he was ready to move the sale forward. A copy of that letter is attached as Exhibit W.

300096701v5 0996081

105.   Green has at no time taken any action, the effect of which would be to withdraw or revoke his exercise of the option to purchase the Gold Center property or to acquire the Gold Center property.

106.   Hausman has at no time taken any action, the effect of which would be to release or discharge Green from his exercise of the option to purchase the Gold Center property.

107.   Hausman has performed all of his obligations under the Lease and is ready, willing, and able to proceed with the sale of the Gold Center property to Green.

108.   At a meeting of the GCI board of directors held March 14, 2017, Green sought approval to begin a study and search relating to the relocation of the Gold Center business from Springfield, Illinois, to a location in the State of Florida.   A copy of the minutes from that meeting is attached as Exhibit X.

109.   Green and Wagoner voted to approval of Green's request, but Hausman voted against it.

110.   At a subsequent meeting of the GCI board of directors held August 31, 2017. Green announced that he had identified a parcel of property located in Naples, Florida, from which to conduct the Gold Center business.   A copy of the minutes from that meeting is attached as Exhibit Y.

111.   On information and belief, Green intends to move the Gold Center business to Naples, Florida, in the summer of 2018.

112.   If allowed to occur, the move to Florida will harm the financial interests of the Gold Center business by disturbing its customer and supplier base, requiring the hiring and training of new employees, and unnecessarily expending funds for moving and acquiring of new trade fixtures and equipment.

300096701v5 0996081

113.    Moreover, the move will substantially impair Hausman's ability to participate in the corporate affairs, thus defeating his expectations as a shareholder and board member.

## USURPATION OF GOLD CENTER OPPORTUNITIES

114.    Green has unlawfully usurped, appropriated, and diverted opportunities belonging to the Gold Center business.

115.    As noted above, Green used vans from his automobile dealerships, licensed with "dealer plates," to transport large amounts of precious metals on behalf of the Gold Center business.  Those vans were not equipped with features for the safe and secure transportation of large amounts of precious metals.

116.    On information and belief, Chrysler Corporation or some other automobile company has paid Green or the Green Family Stores, Inc., or some affiliated entity $3,000.00 annually per vehicle with dealer plates used by the Gold Center business.

117.    The payment for the use of the vehicles in the conduct of the Gold Center business is a corporate opportunity in that it is an incident to the business of the Gold Center business.

118.    Although the payments for the uses of these vehicles rightfully belong to the Gold Center business, without consent of the Gold Center business, Green has diverted those payments to himself or to other entities he controls.

119.    On information and belief, a portion of the commissions earned by insurance producers or agents on the premiums paid by the Gold Center business for some or all of its contracts of insurance is paid to Green Family Insurance, Inc.

120.    The receipt of those payments relating to the Gold Center business insurance is a corporate opportunity belonging to the Gold Center business.

21

121.    Although the payments relating to the Gold Center business insurance rightfully belong to the Gold Center business, without consent of the Gold Center business, Green has diverted those payments to himself or to other entities he controls.

## COUNT I

### (Dissolution of Corporations or Ordered Purchase of Shares)

122.    Hausman realleges and incorporates by reference paragraphs 1 through 121 of this Verified Complaint as though fully set forth herein.

123.    None of the shares of GCI, IDC, or IATI are listed on a national securities exchange or are regularly traded in a market maintained by one of more members of a national or affiliated securities association.

124.    This Count is brought pursuant to Section 12.56 of the BCA, which authorizes the Court to order, *inter alia,* dissolution of a non-public corporation or the purchase of the shares of a petitioning shareholder by either the corporation or other shareholders for fair value when those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent or when the assets of the corporation are being misapplied or wasted.

125.    Green and Wagoner are guilty of continuing oppressive conduct to Hausman and engaging in a pattern of conduct to freeze Hausman from participation in corporate affairs in that they:

    a.    have changed the access codes to the Gold Center property, preventing Hausman to access the Gold Center building;

    b.    have denied Hausman access to all of the regularly prepared financial records of GCI, IDC, and IATI;

    c.    have denied and constructively denied Hausman of his right to review records properly requested under Section 7.75 of the BCA;

300096701v5 0996081

d.      have refused to investigate and to bring suit on behalf of GCI, if appropriate, regarding illegal, improper, or wasteful acts as alleged above;

e.      have failed to properly clean and care for the Gold Center property; have burned hazardous waste on the Gold Center property; and have generally engaged in conduct, the effect of which may diminish the value of the Gold Center property;

f.      have threatened and plan to relocate the Gold Center business from Springfield, Illinois, to Naples, Florida; and

g.      have generally excluded Hausman and frozen him out of the operations of GCI, IDC, and IATI.

126.    The assets of GCI, IDC, and IATI have been and continue to be misapplied or wasted by Green and Wagoner in that they:

a.      hired Wagoner's spouse, Jennifer Wagoner, at a salary of $3,500.00 per month even though she performed no work for the Gold Center business;

b.      abandoned policies to properly account for precious metal purchases and gold inventory and for the safe and secure transportation of precious metals;

c.      engaged in transactions for the purchase or sale of valuable coins and currency that were financially imprudent;

d.      engaged in transactions with Ademota Adeniji, and either knew or should have known of a substantial risk that the gold and jewelry in those transactions may have been stolen;

e.      turned over to Denney or BD Luxury LLC a significant portion of the space of the Gold Center property for the operation of a jewelry business without a proper sublease or any other known consideration from him;

300096701v5 0996081

f.     failed to account for a 2-carat diamond;

g.     failed to pay all or pay the proper amount of sales taxes on the diamond transaction with P.C. as described above;

h.     placed counterfeit coins and counterfeit holders into commerce in violation of the Hobby Protection Act;

i.     burned hazardous computer circuit boards without the requisite equipment and authority, exposing GCI to liability for violation of environmental protection laws and to the Landlord for clean-up costs;

j.     entered into a transaction with Gramco without payment, security, or prior insurance resulting in a significant financial loss;

k.     failed to account to Hausman with regard to corporate operations and affairs; and

l.     unlawfully diverted, appropriated, and usurped opportunities belonging to the Gold Center business to Green or other entities controlled by Green.

127.    The freeze-out of Hausman by Green and Wagoner and the misapplication and waste of assets belonging to the corporations constitute a failure to meet the reasonable expectations of Hausman to participate in the management of the corporations and to obtain a fair return on his investment.

128.    Pursuant to Section 12.60 of the BCA, 805 ILCS 5/12.60, the Court is empowered to appoint an interim receiver and a liquidating receiver to wind up the affairs of a dissolving corporation.

300096701v5 0996081

129.    Without the supervision of a court-appointed receiver, any winding up process will result in further oppressive actions by Green and Wagoner and the misapplication or waste of corporate assets.

130.    Pursuant to Section 12.56 of the BCA, the Court in addition to ordering the dissolution of a corporation or a buy-out of minority shares the Court is empowered to prohibit or set aside corporate actions as well as impose other legal and equitable remedies.

131.    Pursuant to Section 12.56 of the BCA, the Court may also prohibit or set aside any action of the corporation.

WHEREFORE, Hausman prays that the Court enter an Order:

    a.    dissolving GCI, IDC, and IATI;

    b.    enjoining Green and all Defendants from selling, disposing, or transferring assets of GCI, IDC, or IATI during the dissolution or buy-out process;

    c.    enjoining Green and all Defendants from relocating, destroying, concealing, or otherwise disposing of the Gold Center business, all of its assets, trade fixtures, other items used in the operation of the Gold Center business, inventory, and all business records of the Gold Center business during the dissolution or buy-out process;

    d.    directing an accounting of the affairs of GCI, IDC, and IATI;

    e.    appointing a receiver to supervise the winding up of GCI, IDC, and IATI; or

    f.    alternatively, requiring the purchase of Hausman's shares in GCI, IDC, and IATI at a fair value in accordance with Section 12.56 of the BCA; and

    g.    granting such other relief as the court deems proper.

300096701v5 0996081

## COUNT II

### (Mandamus to Compel Examination of Records)

132.   Hausman realleges and incorporates by reference paragraphs 1 through 131 of this Verified Complaint as though fully set forth herein.

133.   Hausman has a statutory right to examine the books and records of GCI, IDC, and IATI, and Defendants have a statutory duty to allow such examination.

134.   Hausman has made a written demand to examine records and has stated with particularity both the records sought to be reviewed and the purpose for the demand.  (Ex. N.)

135.   Defendants have failed to perform their duties under Section 7.75 of the BCA by refusing to provide the records and/or constructively denying the inspection of the records.

136.   Pursuant to Section 7.75(d) of the BCA, the corporations or the officers thereof that refuse the examination of books and records under Section 7.75 "shall be liable to such shareholder, in a penalty up to ten percent of the value of the shares owned by such shareholder."

137.   Defendants have no just excuse for failing to perform the duties required by Section 7.75 of the BCA.

WHEREFORE, Hausman prays that the Court enter an Order:

a.   issuing a writ of *mandamus* requiring Defendants to produce the requested records for examination;

b.   imposing a penalty upon Defendants, jointly and severally, in the amount of 10% of the value of the shares owned by Hausman in GCI, IDC, and IATI, and entering judgment thereon in Hausman's favor; and

300096701v5 0996081

c.      granting such other relief as the Court deems proper.


Dated:  /s/January 26, 2018

                                        Respectfully submitted,


                                        By /s/Charles R. Schmadeke
                                        James M. Lestikow (#01625608)
                                        jlestikow@hinshawlaw.com
                                        Charles R. Schmadeke (#2489813)
                                        cschmadeke@hinshawlaw.com
                                        Esther J. Seitz (#6292239)
                                        eseitz@hinshawlaw.com
                                        Hinshaw & Culbertson LLP
                                        400 South Ninth Street, Suite 200
                                        Springfield, IL 62701
                                        Telephone:  217-528-7375
                                        *Attorneys for Plaintiff*

300096701v5 0996081

## VERIFICATION

Pursuant to 28 U.S.C. §1746, I, James R. Hausman, certify, verify, and state under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint and the allegations contained therein are true and correct.

Executed: _____1/24/2018_____

_____
James R. Hausman

300096701v5 0996081